UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| CHOICE ENERGY, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>SUNSEA ENERGY LLC, *et al.*,<br><br>    Defendants. | Civil Action<br>No. 1:20-CV-14139-KMW-SAK<br><br><br>**OPINION** |

**Jennifer Gorga Capone, Esq.**
BEVAN, MOSCA & GIUDITTA, P.C.
220 Airy Road, Suite 200
Basking Ridge, NJ 07920

**Jesse C. Morris, Esq.**
**John D. Coyle, Esq.**
COYLE & MORRIS LLP
201 Littleton Road, Suite 210
Morris Plains, NJ 08950

*Counsel for Plaintiff Choice Energy, LLC*

**Robert L. Sanzo, Esq.**
LITCHFIELD CAVO LLP
1515 Market Street, Suite 1130
Philadelphia, PA 19102

*Counsel for Defendants SunSea Energy LLC; SunSea Energy, NJ, LLC; SunSea Energy Holdings, LLC; Protel Marketing, Inc.; Eze Sales & Marketing Inc.; Jacob Adigwe; Romaine Reid; and Germaine Reid*

**WILLIAMS, District Judge:**

## I. INTRODUCTION

  This matter comes before the Court by way of the Motion for Summary Judgment filed by

defendants SunSea Energy LLC; SunSea Energy, NJ, LLC; SunSea Energy Holdings, LLC; Protel

Marketing, Inc.; Eze Sales & Marketing Inc.; Jacob Adigwe; Romaine Reid; and Germaine Reid (collectively, "Defendants"). Defendants' Motion has been opposed by plaintiff Choice Energy, LLC ("Choice Energy" or "Plaintiff"). For the reasons set forth below, Defendants' Motion for Summary Judgment is granted, in part, and denied, in part.

## II.    BACKGROUND

Choice Energy is an independent energy supply company, or "ESCO," that is licensed to provide alternative electric services to residential and business consumers in New Jersey, Connecticut, Ohio, and Pennsylvania. *See* Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶¶ 3, 4. Defendant SunSea Energy LLC—together with its affiliates, SunSea Energy, NJ, LLC and SunSea Energy Holdings, LLC (together, "SunSea")—is also an ESCO licensed in various states.[1] *See* Pl.'s Supp. Statement of Disputed Material Facts ("Pl.'s SSMF") ¶¶ 27–28. Each of the SunSea entities is solely owned and operated by defendant Jacob Adigwe. *See id.* ¶¶ 9–12.

Generally speaking, ESCOs obtain licenses to operate in states that have deregulated their energy markets, allowing consumers to elect to have their electricity services provided by an ESCO instead of a local utility. To obtain new customers, ESCOs like Choice Energy and SunSea rely on a variety of telemarketing strategies, the most important of which for purposes of this case is telemarketing.

Choice Energy brings this action against SunSea alleging that it engaged in an unlawful telemarketing scheme to solicit and obtain new customers, and that it did so while falsely claiming to be calling on behalf of Choice Energy. Also named as defendants in this case are SunSea's telemarketing vendors, Eze Sales & Marketing, Inc. ("Eze Sales") and Protel Marketing, Inc.

---

[1] Although these entities are organizationally distinct, all parties appear to agree that they should be referred to collectively as "SunSea" or "SunSea Energy."

("Protel"). Notwithstanding the fact that these entities are, as a matter of form, organizationally distinct from SunSea, Choice Energy maintains that Eze Sales and Protel are effectively SunSea's marketing arms. For example, Eze Sales, like SunSea, is also solely owned and operated by Mr. Adigwe. *See* Pl.'s SSMF ¶¶ 22–26. Similarly, Protel is solely owned and operated by defendant Romaine Reid—a vice-president of SunSea. *See* Pl.'s SSMF ¶¶ 17–18.[2]

Choice Energy filed its Complaint in this action on October 8, 2020. (ECF No. 1.) As previously indicated, Choice Energy alleges that Defendants designed and employed a telemarketing strategy by which they misled consumers into believing that they were dealing with an ESCO other than SunSea. But more specifically, Choice Energy contends that Defendants' telemarketers held themselves out as Choice Energy representatives. Thus, consumers who agreed to switch their services, or who otherwise resented the uninvited solicitations, falsely believed that Choice Energy was behind those efforts.

According to Choice Energy, there are several commercial motives for engaging in such a practice, which is known in the energy industry as "slamming." First, Choice Energy reasons that SunSea, by holding itself out as another ESCO, allowed it to solicit and obtain new business without potential customers being warded off by SunSea's allegedly poor reputation concerning its pricing and marketing tactics. Beyond the immediate benefit of obtaining new customers, claiming to be another ESCO would have also enabled SunSea to discreetly circumvent state and federal marketing laws—including the National Do Not Call Registry and the New Jersey Do Not Call Law. Consequently, ESCOs that disregard do-not-call registries unfairly gain access to a

---

[2] The Complaint also names as a defendant Mr. Reid's brother, Germain Reid ("G.R."), who is alleged to be a "director of Protel." Compl. ¶ 10. In their Motion, Defendants concede that G.R. is listed as a director of Protel, but state that his only role was to "facilitate the registration of the company at its inception." Defs.' Br. at 2. Beyond this, G.R. did not have "any other involvement with [Protel]." *Id.* In its Opposition, Choice Energy does not appear to dispute G.R.'s limited role. Nor does it point to anything in the record suggesting any involvement to the contrary. Thus, at the outset, the Court grants Defendants' Motion with respect to G.R. and enters summary judgment on all Counts.

wider market of potential customers and face no competition from competing ESCOs who do comply with the law. Lastly, and to the extent consumers objected to such solicitations, they incorrectly directed their complaints at Choice Energy.

### A. Consumer Complaints and Reports

Shortly after SunSea entered the alternative energy market, Choice Energy claims that it began receiving an influx of complaints from consumers claiming that they were receiving numerous and at times harassing calls from Choice Energy. (ECF No. 75-4 at 1.) For example, on August 19, 2020, one consumer from Columbus, Ohio ("R.P.")[3] submitted the following complaint against Choice Energy with the Better Business Bureau ("BBB"):

> I keep getting calls from people at CHOICE ENERGY claiming to save me money on energy costs. This is the second time I have filed with the BBB[.] I am on the national DNC [registry] but they call a few times a week a guy claiming to be named [T]homas called me from a spoofed number again today I asked whom he worked for he said CHOICE ENERGY[.] I asked to speak to a manager[;] he declined to transfer me then hung up! This is harassment! 8/18 @ 3:35pm EST! STOP THESE CALLS!

(ECF No. 75-8 at 4.) However, after investigating R.P.'s complaint, Choice Energy determined that neither the consumer's name, address, nor telephone number had ever been in its database. (*Id.*) Nor did Choice Energy's call records indicate that the consumer's phone number was ever dialed. (*Id.*)

In an affidavit Choice Energy has since obtained from R.P., the consumer claims that despite being on the National Do Not Call Registry since 2007, he had received numerous calls from telemarketers in the summer of 2020, attempting to persuade him into switching his electricity supplier. (ECF No. 75-8 at 1.) In several of these calls, the telemarketers identified themselves as representatives of Choice Energy. (*Id.*) In others, the telemarketers said that they

---

[3] To protect consumer identities, the Court uses acronymized initials in place of the consumer's name.

were calling on behalf of American Electric Power, R.P.'s electric utility company. (*Id.*) R.P. recalls one particular incident on August 18, 2020, in which he received a call from a telemarketer promising R.P. that he "could save money if [he] switched electric suppliers." (*Id.* at 2.) When B.P. asked to be transferred to a manger, the telemarketer "declined and hung up on [him]." (*Id.*)

This was not an isolated incident involving a single consumer. Indeed, record evidence shows that Choice Energy was receiving numerous calls and written complaints from consumers reporting nearly identical telemarketing experiences. (ECF No. 75-4 at 11–12.) What is more, many of these consumers resided in states in which Choice Energy did not operate. (*Id.*) Critically, some of these consumers had switched or attempted to switch their electric services believing they were being solicited by Choice Energy, only to later discover that the enrollment was being completed by a SunSea telemarketer.

For example, on August 1, 2020, Choice Energy received a call from a frustrated consumer ("V.S.") asking why Choice Energy's telemarketers say they are calling on behalf of Choice Energy when they first call, but later claim that they are calling from SunSea on a second call. (ECF No. 75-4 at 12.) V.S. reported that he received an initial call from a Choice Energy telemarketer claiming to be from Choice Energy, but that when he agreed to enroll with Choice Energy, he was transferred to another telemarketer claiming to be on behalf of SunSea. (*Id.*)

By way of further example, another consumer ("D.S.") contacted Choice Energy on September 25, 2020, wishing to cancel the electricity services she had signed up for. However, D.S. was not a Choice Energy customer, and Choice Energy was otherwise unable to locate D.S. in its telemarketing database. During the course of the call, D.S. discovered that she had actually been enrolled with SunSea, rather than Choice Energy, and explained that she was calling because the telemarketing agent had specifically given her Choice Energy's customer service number. A

recording of this call, as well as SunSea's "Welcome Package," has been made part of the evidentiary record. (ECF No. 75-4 at 5–7.)

**B. SunSea's Alleged "Two-Call Scheme"**

Choice Energy claims that Defendants developed and employed what it describes as a "two-call telemarketing scheme." *See* Pl.'s SSMF ¶ 59. According to Choice Energy, a SunSea telemarketer first places an initial call to consumers in an attempt to persuade them to switch energy providers ("Call #1). *See id.* During this call, the SunSea telemarketer falsely claims to be calling on behalf of Choice Energy or some other affiliate, and proceeds to entice the consumer with promises of discounts, rebates, and other perks. *See* Pl.'s Opp. Br. at 10, 12, 14. If the customer declines, calls of this type persist, regardless of whether the consumer is on a do-not-call list. (ECF No. 75-8 at 4.)

However, if a consumer agrees to switch energy providers, the telemarketer then informs the consumer that she will either be (1) transferred to an associate to effectuate the switch; or (2) separately contacted by an associate within a short period of time to do the same. *See* Pl.'s Opp. Br. at 12, 14–15, 17. After Call #1 ends, the consumer is subsequently transferred or contacted by another associate ("Call #2"), during which time a telemarketer informs the consumer for the very first time that she is about to switch her services to SunSea. *See id.*

As evidence of this alleged scheme, Choice Energy has pointed to, among other things, consumer complaints; recorded calls between consumers and SunSea telemarketing agents; and testimony from specific consumers recounting their experiences with SunSea. Among other exhibits attached to Choice Energy's Opposition is an affidavit from an Ohio resident ("W.S.") who states that she received numerous phone calls from SunSea telemarketers falsely claiming to be representatives of Choice Energy. (ECF No. 75-7 at 2.) W.S., who has been on the Do Not Call

Registry since 2003, describes one particular incident on October 22, 2020, in which she received a call from a telemarketer claiming that she was overpaying on her electric bills. (*Id.*) During this call, the telemarketer repeatedly stated that he was calling on behalf of Choice Energy, and "even spelled it out" as "C, H, O, I, C, E." (*Id.*) After taking W.S.'s information, the telemarketer informed her that in 20 to 30 minutes, she would receive another call from the "verification department of Choice Energy" to effectuate her enrollment. (*Id.*) When W.S. continued asking what the company was, the telemarketer changed his answer to "Choice Energy program." (*Id.*)

Approximately 20 minutes after the first call ended, W.S. received a second call from a telemarketer identifying himself as "Nick Anderson." (*Id.*) However, "[a]fter a minute and a half, the [telemarketer] said [that] he was calling with SunSea and that SunSea would be my new supplier." (*Id.*) At this point, W.S. stated that she was not interested and ended the call without switching her services. (*Id.* at 1–2.) Audio recordings of both calls have been included with W.S.'s affidavit.

C. **Regulatory Sanctions Against SunSea**

During the pendency of this case, at least two state regulatory agencies sanctioned SunSea for engaging in false, misleading, and deceptive telemarketing practices.

1) **New York**

Between July 5, 2019, and November 4, 2020, the New York Department of Public Service ("DPS") received approximately 116 consumer complaints alleging that SunSea was engaging in false, deceptive, and misleading sales practices, including (1) falsely promising savings; (2) enrolling consumers without their authorization; (3) failing to remove customers from SunSea's telemarketing database upon their request; and (4) misleading consumers into believing that they

were speaking with a representative from an energy company other than SunSea. (ECF No. 75-5 at 114.[4])

During the course of its investigation, DPS determined that SunSea's telemarketing efforts were directed to consumers in what it described as a "three-part process." (*Id.*) First, SunSea telemarketers would make an initial call to consumers to "explain the benefits of the offer and obtain customer information." (*Id.*) If customers agreed to move forward with enrollment, they would receive a second call from a SunSea telemarketer to confirm their information and their intent to enroll. (*Id.*) Thereafter, the telemarketer proceeded to effectuate customer enrollment through a third-party verification process ("TPV"). (*Id.*) DPS concluded that the majority of SunSea's violations occurred during the initial call. (*Id.*)

In addition to the 116 consumer complaints previously mentioned, at least two DPS staff members had also received similar unsolicited "cold calls" on their personal phones from SunSea telemarketers. (*Id.*) These calls also proceeded in "the same three-part format" reported by consumers. (*Id.*) One staff member described her experience as follows:

> [O]n September 19, 2020 at 1:05pm, I received an automated call that I was overcharged on my utility and to push 1 if I wanted to [ ] be reimbursed. I was told I would receive a rebate check and a 30% discount on my gas bill and 30% discount on my electric bill and $100 gas rebate check and $100 electric rebate check. When I asked how he got my number, [the telemarketer] told me he was calling from [the public utility].
>
> He [then] told me that I would be receiving an immediate call from **Choice Energy** for verification. He instructed me to answer "yes" to all questions and "no" to the question about receiving government assistance. The call lasted approximately 10 minutes.
>
> I received the follow up at 1:16pm from a representative who identified herself as Kate Pole from **SunSea Energy**. I asked her to hold the line, that I had multiple

---

[4] *See also Proceeding on Motion of the Commission to Seek Consequences against SunSea Energy, LLC for Violations of the Uniform Business Practices*, No. 20-M-0589, 2021 WL 2014715, at *2 (N.Y.P.S.C. May 18, 2021) (Order Revoking SunSea Energy LLC's Eligibility to Serve Customers in New York).

beeps for call waiting; [ ] she told me she would be fired if I answered them. After she began instructing me on the verification process, she repeatedly told me to hold and eventually dropped the call.

(ECF No. 75-5 at 103–04) (emphasis added).[5]

In response to an order to show cause issued by the New York Public Service Commission ("NYPSC"), SunSea did not deny that these calls had occurred, but rather attempted to attribute them to the "rogue actions of [its] marketing vendors," namely a Pakistani company by the name of "RMC BPO." (*Id.* at 119.) In arguing that its license to operate in New York should not be revoked, SunSea also offered reassurances that it had since terminated its arrangement with RMC BPO (*Id.*) The NYPSC, however, rejected this explanation as disingenuous because the consumer complaints had "originated with an entirely different vendor"—Eze Sales. (*Id.* at 120.)

Based on the foregoing evidence, the NYPSC ultimately revoked SunSea's license to operate as an ESCO in New York on May 13, 2021 (*Id.*) In doing so, the NYPSC noted that SunSea exhibited a "pattern of consistent disregard" for consumer protection laws, and following months of consumer complaints without any corrective action, concluded that SunSea was in fact willfully noncompliant with its regulatory obligations. (*Id.*) In addition, the NYPSC also ordered SunSea to return each of its customers to full utility service. (*Id.*)

## 2) **Maryland**

On June 4, 2020, the Maryland Office of People's Counsel ("MOPC") also initiated a regulatory action against SunSea, alleging that it was targeting Maryland consumers with

---

[5] Another staff member ("C.B.") also offered testimony recounting a nearly identical incident in which she received a call from a telemarketer attempting to persuade her to switch her electric services to Choice Energy, only to subsequently receive another phone call from a woman who attempted to enroll her for SunSea's services. (ECF No. 75-5 at 108.)

fraudulent and deceptive telemarketing practices.[6] MOPC claimed that SunSea had, among other things, "attempted to enroll Deputy People's Counsel William F. Fields as an electric and gas retail customer through deceptive practices and other means prohibited" by Maryland law. (ECF No. 75-5 at 129.) Though, MOPC also claimed that "these types of improper marketing and contracting actions extend to customers or potential customers other than Mr. Fields." *Id.* Mr. Fields described his experience as follows:

> At approximately 12:30 p.m. on May 14, 2020, I received a call at home from a person who said they were from BGE [*i.e.*, Baltimore Gas & Electric] Verification Department. The person asked if I had received my $50 rebate yet. I said that I had not. He [then] said that he would be able to provide that for me. The caller also . . . said that this was part of the **Choice Energy program** and that I was qualified for this program because I have paid my BGE bill on time for the last six months.

(ECF No. 75-5 at 123) (emphasis added). After providing certain account-related information, Mr. Field was then informed that he "would receive a call in 15 minutes to receive a confirmation number." (*Id.* at 124.)

At approximately 12:55 p.m., Mr. Fields received the second call from a telemarketer reportedly named "Richard White." (*Id.*) During the call, Mr. Fields asked the telemarketer whether "his call was related to the call [he] had received approximately 15 minutes before," to which the telemarketer "said that it was." (*Id.*) This time, however, the telemarketer claimed that his call "was part of the BGE Choice Option and that **SunSea** [was] an alternate supplier." (*Id.*) Mr. Fields followed the telemarketer's instructions and proceeded to confirm his enrollment via TPV. (*Id.*) The following day, Mr. Fields confirmed with BGE that SunSea had initiated a switch of his electric service. (*Id.* at 125.)

---

[6] *See also Complaint of the Maryland Office of People's Counsel against SunSea Energy, LLC*, Order No. 89914, 2021 WL 3709514 (Md. P.S.C. Aug. 18, 2021) (Order Assessing Civil Penalty).

During subsequent proceedings before the Maryland Public Service Commission ("MPSC"), SunSea "generally denied the allegations that it committed fraud or engaged in deceptive marketing and enrollment practices." (*Id.* at 130.) Though, SunSea did acknowledge the call to Mr. Fields. To this end, SunSea offered an identical defense—that its vendor, "Blend BPO," acted as "a rogue agent by going outside the approved script, and that Blend BPO's contract was terminated as soon as SunSea learned of its interactions with Mr. Fields." (*Id.* at 135.) However, the MPSC also found this defense unpersuasive because the first call to Mr. Fields originated with "a contractor hired by SunSea." (*Id.*)

At the conclusion of the proceedings, the MPSC found that there was "compelling evidence of a multitude of violations [committed] by SunSea over the short duration of its presence in Maryland." (*Id.* at 146.) Among other things, the MPSC determined that SunSea had committed "hundreds" of violations and evinced "a pattern and practice of violating applicable Maryland laws and regulations by intentionally providing false information [to consumers] and engaging in deceptive practices." (*Id.* at 147–49.) Notwithstanding these violations, the MPSC declined to revoke SunSea's license based on its subsequent efforts to mitigate harm and achieve compliance. (*Id.* at 153.) However, the MPSC did ban SunSea from marketing, soliciting, or enrolling Maryland customers by telephone, and assessed a civil penalty against it for $400,000 (*Id.*)

## III.    LEGAL STANDARD

A court may grant summary judgment when the materials of record "show[ ] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410,

416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.    DISCUSSION

In the instant Motion, Defendants seek the entry of summary judgment with respect to each claim asserted against them by Choice Energy for violations of the Lanham Act, 15 U.S.C. § 1125 (Counts I–IV); violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. STAT. ANN. §§

56:8-1 *et seq.* (Counts V–VI); fraud (Count VII); defamation (Count VIII); trade libel (Count IX); and unfair competition (Count X). The Court addresses each in turn.

### A. Lanham Act Claims (Counts I—III)[7]

In passing the Lanham Act, Congress intended to make "actionable the deceptive and misleading use of marks," and "to protect persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127. Though much of the Lanham Act concerns the "registration, use, and infringement of trademarks and related marks, § 1125(a) "is one of the few provisions that goes beyond trademark protection." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003). Indeed, § 1125(a) provides "broad protection against various forms of unfair competition and false advertising, by specifically prohibiting false or misleading factual statements concerning commercial products." *Smart Vent, Inc. v. USA Floodair Vents, Ltd.*, 193 F. Supp. 3d 395, 424 (D.N.J. 2016) (quotation marks omitted); *see also Dastar Corp.*, 539 U.S. at 32 ("Section [1125(a)] of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill.") But perhaps most importantly, it "allows one competitor to sue another if it alleges unfair competition arising from false or misleading [conduct]." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014).

Section 1125(a) provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device,

---

[7] Count IV of the Complaint purports to assert a claim against Defendants for violating 15 U.S.C. § 1117. *See* Compl. at 12. However, § 1117 does not establish a private cause of action; rather, it permits plaintiffs to elect to recover an award of statutory damages in lieu of actual damages and profits. *See Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 687 (D.N.J. 2015). Technically speaking, particular forms of relief do not constitute actionable legal claims, and accordingly should not be designated as distinct counts in a complaint. *See Benhur v. Madavaram*, No. 15-6826, 2015 WL 6739109, at *6 (D.N.J. Nov. 2, 2015) (noting distinction between a "claim" and a "prayer for relief"); *see also Kauffman v. PSPCA*, 766 F. Supp. 2d 555, 560 (E.D. Pa. 2011) ("The relief a plaintiff seeks, and the claims he asserts, are [ ] conceptually distinct components of a complaint, and there is no need for a plaintiff to devote a separate count of a complaint to a request for a certain type of relief."). However, Defendants do not move for summary judgment on these grounds, and the Court sees no other need to address Count IV.

or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Thus, § 11215(a) provides two bases for liability: (1) false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ("false association")[8]; and (2) false representations in advertising concerning the qualities of goods or services ("false advertising").[9] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

In addition to false association and false representation, § 1125(c) also provides a private cause of action for trademark dilution. A dilution claim under the Lanham Act is intended to "protect famous marks from unauthorized users that attempt to trade upon the goodwill and established renown of such marks and, thereby, dilute their distinctive quality." *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 240 (3d Cir. 2003). Section 1125(c), in relevant part:

---

[8] The elements of a false association claim under the Lanham Act track the elements of a common law trademark infringement claim: a plaintiff must prove that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 230 (3d Cir. 2017) (quotation marks omitted).

[9] A claim for false advertising requires a plaintiff to prove that (1) the defendant has made false or misleading statements as to its own product or that of another; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, such as in declining sales or loss of good will. *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).

14

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c).[10]

In this case, Choice Energy asserts Lanham Act claims against Defendants for false association, false advertising, and dilution. It claims that Defendants, by unlawfully using Choice Energy's name when engaging in unlawful telemarketing practices, have created confusion in the consumer market, and harmed its good will and reputation in the same. *See* Compl. ¶¶ 62–81.

In their Motion for Summary Judgment, Defendants do not offer any particularized legal argument as to why any of these claims should fail. Nor do they discuss, much less rely on, their essential elements. Rather, Defendants present a purely factual attack. Chiding Choice Energy's claims as "illogical" and "baseless," Defendants sweepingly argue that there is simply "no evidence" of any Lanham Act violation whatsoever.[11] Defs.' Br. at 7. But more specifically, Defendants claim that there is no evidence to prove that SunSea telemarketers ever misrepresented themselves when soliciting potential customers. Notably, Defendants do not dispute the existence

---

[10] To prevail on a dilution claim under the Lanham Act, the plaintiff must show that (1) it is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in § 1125(c)(1); (2) the defendant is making commercial use in interstate commerce of a mark or trade name; (3) the defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services. *See E.A. Sween Co. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 573 (D.N.J. 2014); *see also Times Mirror Mags., Inc. v. Las Vegas Sports News*, L.L.C., 212 F.3d 157, 163 (3d Cir. 2000).

[11] The Court also observes that Defendants' Motion invariably attempts to argue that Choice Energy "has no *admissible* evidence to prove that any Sun[S]ea marketer ever used the Choice Energy name during a marketing call." *See* Defs.' Br. at 6, 8, 10. In doing so, it makes no particularized objection or otherwise cites to a specific Federal Rule of Evidence. Without more meaningful articulation, the Court declines to address such objections at this time. *See Graceway Pharms., LLC v. Perrigo Co.*, 722 F. Supp. 2d 566, 571 (D.N.J. 2010) ("Arguments absent substantial development are waived."); *but see* Fed. R. Civ. P. 56(c)(2) Advisory Committee's Note to 2010 Amendment ("[F]ailure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.").

Case 1:20-cv-14139-KMW-SAK    Document 95    Filed 02/09/24    Page 16 of 24 PageID: 1687

or veracity of the consumer complaints and testimony, but rather appear to take issue with Choice Energy's ability to prove that SunSea's telemarketers specifically were on the other end of these calls. The Court disagrees.

It is well-settled that to survive summary judgment, an opponent must "go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini*, 795 F.3d at 416. Here, Choice Energy has done just that. In its Opposition to Defendants' Motion, Choice Energy has pointed to numerous customer complaints evincing a virtually identical pattern of telemarketing; sworn witness testimony from consumers detailing the substance of those solicitations; audio recordings of telephone calls purportedly between SunSea's agents and potential customers; and the official regulatory findings from at least two state agencies concerning the same telemarketing practices at issue in this case. Based on this evidence, a reasonable jury could conclude that Defendants falsely or misleadingly used Choice Energy's name when it solicited potential customers.[12]

It is certainly Defendants' prerogative to deny that they or their telemarketers were behind the telephone calls subject to these consumer complaints. Defendants are also certainly within their right to argue that the weight of Choice Energy's evidence does not favor its claims. Neither of these approaches, however, are compatible with a successful, much less proper, motion for summary judgment. *See Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006) ("A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."). In any case, the notion that

---

[12] Defendants also submit that Choice Energy's claims are "illogical" because "every consumer who agrees to sign with Sunsea[ ] must go through a third party verification process on the same call, during which the consumer is specifically told the name of the energy supply company." Defs.' Br. at 7. This argument is a red herring. Such evidence does not disprove Choice Energy's claims that Defendants' telemarketers misrepresented themselves during an initial call to consumers. Nor does this fact address the population of consumers who reported receiving such calls but never ultimately signed with SunSea.

Choice Energy has adduced "no evidence" to support its claims is as much exaggerated as it is wrong. For all of these reasons, Defendants' Motion for Summary Judgment is denied.[13]

## B. NJCFA Claims (Counts V–VI)

The NJCFA is "an expansive remedial statute" that "targets unlawful sales and advertising practices designed to induce customers to purchase merchandise or real estate." *Sun Chem. Corp. v. Fike Corp.*, 981 F.3d 231, 236 (3d Cir. 2020) (citing *Real v. Radir Wheels, Inc.*, 969 A.2d 1069, 1075 (N.J. 2009)) (quotation marks omitted). The statute has "three main purposes: to compensate the victim for his or her actual loss; to punish the wrongdoer through the award of treble damages; and, by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud." *Lettenmaier v. Lube Connection, Inc.*, 741 A.2d 591, 593 (N.J. 1999) (quotation marks omitted). To prevail on an NJCFA claim, a plaintiff must prove (1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *See Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 606 (D.N.J. 2016); *see also Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009).[14]

Here, Defendants' Motion only pertains to the first prong. "Unlawful conduct" under the NJCFA primarily falls within two categories: (1) "affirmative acts" and (2) "knowing omissions." *Coba v. Ford Motor Co.*, 932 F.3d 114, 124 (3d Cir. 2019).[15] Within these categories further fall seven, specific unlawful practices expressly delineated by § 56:8-2, which prohibits

---

[13] Because the "elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law," *Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 317–18 (D.N.J. 2006), the Court also denies Defendants' Motion insofar as it seeks summary judgment on Choice Energy's common law claim for unfair competition under Count VI.

[14] The Court notes that both "[c]onsumers and commercial competitors have standing to bring claims under the NJCFA." *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295–96 (D.N.J. 2006).

[15] Case law in this District also commonly identifies a third category of unlawful acts, namely *per se* regulatory violations. That, however, is not alleged here.

> [t]he act, use, or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon the act in connection with the sale or advertisement of any merchandise[.]

N.J. STAT. ANN. § 56:8–2; *see also Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 558 (D.N.J. 2013). However, NJCFA plaintiffs are not constrained to the species of "unlawful conduct" delineated under § 56:8–2, and indeed are permitted to predicate their claims on any other "method, act, or practice declared unlawful" under the statute. N.J. STAT. ANN. § 56:8-19.

Here, Choice Energy claims that Defendants violated the NJCFA insofar as they used Choice Energy's name and contact information to deceive or mislead potential consumers into enrolling with them. In addition, Choice Energy also charges that Defendants violated § 56:8-2.25(a), which states:

> It shall be an unlawful practice for any person conducting or transacting business under an assumed name and filing a certificate pursuant to [§ 56:1-2] to intentionally misrepresent that person's geographic origin or location or the geographic origin or location of any merchandise.

N.J. STAT. ANN. § 56:8-2.25(a).[16]

Similar to their prior argument regarding Choice Energy's Lanham Act claims, here Defendants offer a single, conclusory assertion that the record "is utterly devoid of evidence that Sunsea[ ] engaged in any of the fraudulent behavior deemed illegal" by the NJCFA. Defs.' Br. at 21. For the reasons previously explained, this is simply not true. Based on the record evidence, a reasonable jury could conclude that Defendants' engaged in the unlawful acts set forth in §§ 56:8-19 and 56:8-2.25(a) of the NJCFA. To this end, Defendants' Motion is denied.

---

[16] Section 56:8-2.25(a) of the NJCFA requires individuals and businesses to register specific trade names before conducting business under the same in New Jersey.

### C. **Fraud (Count VII)**

Count VII of the Complaint sets forth a claim for common law fraud. To prevail on a fraud claim, a plaintiff must prove "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015); *see also Read v. Profeta*, 397 F. Supp. 3d 597, 635 (D.N.J. 2019).

Here, Choice Energy claims that Defendants committed fraud insofar as they made material misrepresentations to consumers during their telemarketing solicitations. Defendants argue that Choice Energy's fraud claim fails on its face because it cannot allege or prove that they ever made a misrepresentation on which Choice Energy specifically has relied. On this point, the Court agrees.

Under New Jersey law, "[t]he actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission." *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000); *see also Schenkel v. Flaster*, 54 F. App'x 362, 364 (3d Cir. 2002). Thus, even assuming Defendants made the misrepresentations claimed, all of them were directed exclusively at consumers. This is to say that Choice Energy could not have received or relied on the alleged misrepresentations at issue. Accordingly, Defendants' Motion as to Count VII is granted. *See Invs. Com. Cap., LLC v. Andujar*, No. A-2354-21, 2023 WL 3669916, at *5 (N.J. Super. Ct. App. Div. May 26, 2023) (affirming summary judgment on fraud claim where no misrepresentations were made specifically to plaintiff).[17]

---

[17] Choice Energy's Opposition attempts to clarify that Count VII, in addition to asserting a claim for legal fraud, also contains a claim for equitable fraud. Here, however, that is a distinction without a difference. *See Banco Popular*

### D. __Defamation and Trade Libel (Counts VIII–IX)__

Counts VIII and IX of the Complaint respectively set forth claims for defamation and trade libel. Because such claims tend to overlap—as well as the fact that the parties offer the same arguments with respect to each—the Court addresses both claims here in a single analysis.

Under New Jersey law, a claim for defamation generally centers around the proliferation of a false, harmful statement that tends to "lower[ ] the defamed person in the estimation of the community or deters third parties from dealing with that person." *Salzano v. N. Jersey Media Grp. Inc.*, 993 A.2d 778, 785 (N.J. 2010). To succeed on a defamation claim, a plaintiff must prove "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1113 (N.J. 2009); *see also Petersen v. Meggitt*, 969 A.2d 500, 507 (N.J. Super. Ct. App. Div. 2009).

Trade libel—also known as injurious falsehood, product disparagement, and commercial disparagement—is a "tort addressing aspersions cast upon one's business operation." *Read v. Profeta*, 397 F. Supp. 3d 597, 651 n.37 (D.N.J. 2019) (quotation marks omitted). Though, the tort "is broader in scope than any of those terms would indicate, and is probably as broad as any injurious falsehood which disturbs prospective advantage." *Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct. App. Div. 2004). Like defamation, trade libel "protect[s] similarly important interests in the free flow of information." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 245 (3d Cir. 2023). But "[w]hile defamation remedies harm to one's reputation, trade libel remedies harm to the reputation of one's property or product." *Id.* To succeed on a trade libel claim, a plaintiff must prove four elements: "(1) publication; (2) with

*N. Am. v. Gandi*, 876 A.2d 253, 261 (N.J. 2005) ("Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them.").

20

malice; (3) of false allegations concerning plaintiff's property or product; and (4) causing special damages, *i.e.*, pecuniary harm." *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 294 (D.N.J. 2016).

Here, Choice Energy claims that Defendants committed defamation and trade libel when they engaged unlawful telemarketing tactics, and did so while falsely claiming to be selling electricity services on behalf of Choice Energy. In their Motion, Defendants assert, again in a conclusory fashion, that there is no evidence to prove the factual allegations underpinning Choice Energy's claims.[18] Again, this is a question for the jury, and their Motion must accordingly be denied.[19]

### E.   <u>Corporate Veil Piercing</u>

Lastly, Defendants argue that neither Mr. Adigwe nor Mr. Reid can be held individually liable on any of Choice Energy's claims, and that such liability can only attach to the institutional defendants in this case.

As an initial matter, the Court observes the fundamental proposition that "a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State, Dep't of Env't Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983). This principle applies "with equal force" in the

---

[18] To be clear, Defendants have not argued that such misrepresentations—to the extent they in fact occurred—constitute defamation or trade libel as a matter of law. They make no mention of the well-established legal standards governing "defamatory" or "derogatory" statements, and their argument does not extend beyond a handful of recycled, hyperbolic assertions that there is "no evidence" with which Choice Energy can prove its claims.

[19] Concerning Count VIII specifically, Defendants alternatively argue that Choice Energy's defamation claim must fail because it has expressly forfeited and waived its right to be compensated in this case for any reputation harm. It is true that the parties have previously entered into a joint stipulation acknowledging that Choice Energy "waives, withdraws and dismisses with prejudice any and all claims it has or might have against all or any of the defendants for reputational damage, lost profits and/or lost revenue." (ECF No. 48.) But Defendants' argument here presumes that a successful defamation claim could only entitle Choice Energy to compensatory damages and nothing more; that is not true. *See Graphnet, Inc. v. Retarus, Inc.*, 269 A.3d 413, 422 (N.J. 2022) (reaffirming that defamation plaintiffs may be entitled to nominal damages) ("Such an award is a judicial declaration that the plaintiff's right has been violated. It serves the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement." (citations and quotation marks omitted)).

context of limited liability companies. *State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 679 n.5 (D.N.J. 2009). It is only under certain, limited circumstances where courts may "disregard the corporate form" and "pierce the corporate veil" to hold stakeholders responsible for the actions of a commercial entity. *Port Drivers Fed'n 18, Inc. v. All Saints Exp., Inc.*, 757 F. Supp. 2d 443, 456 (D.N.J. 2010).

Under New Jersey law, "personal liability will only be imposed if it is demonstrated that the officer or director disregarded the corporate form and utilize[d] the corporation as a vehicle for committing equitable or legal fraud." *Rowen Petroleum*, 899 F. Supp. 2d at 308 (quotation marks omitted). A plaintiff wishing to pierce the corporate veil bears the burden of demonstrating two things. First, a plaintiff must show that there exists "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." *Linus Holding Corp. v. Mark Line Indus.*, LLC, 376 F. Supp. 3d 417, 425 (D.N.J. 2019) (quotation marks omitted). On motions for summary judgment, courts generally assess the sufficiency of the evidence with reference to six factors:

> [1] gross undercapitalization . . . [2] failure to observe corporate formalities, [3] non-payment of dividends, [4] the insolvency of the debtor corporation at the time, [5] siphoning of funds of the corporation by the dominant stockholder, [6] non-functioning of other officers or directors, [7] absence of corporate records, and [8] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Rowen Petroleum*, 899 F. Supp. 2d at 309.

Second, the plaintiff must point to circumstances indicating that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 425 (D.N.J. 2019) (quotation marks omitted). However, "even in instances where one individual shareholder or director dominates the corporate entity, 'liability generally is imposed only where the [dominant party] has abused the privilege of

incorporation by using the [corporate form] to perpetrate a fraud or injustice, or otherwise to circumvent the law.'" *Id.* (quoting *State, Dep't of Env't Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983)).

Here, Defendants' Motion submits that summary judgment as to Mr. Adigwe and Mr. Reid is appropriate because there is no record evidence demonstrating that either has ever abused the corporate form. The Court largely agrees. Choice Energy has not presented any evidence demonstrating that the SunSea entities, Eze Sales, or Protel were grossly undercapitalized, failed to observe corporate formalities, failed to pay dividends, were insolvent, maintained non-functioning officers or directors, or failed to maintain corporate records. Choice Energy apparently concedes as much, as its Opposition merely accuses the individual Defendants of wanting to "hide behind their corporate shields." Pl.'s Opp. Br. at 27.

However, Choice Energy correctly points out that the NJCFA does not demand piercing the corporate veil in order to hold officers and employees individually liable. *See Allen v. V & A Bros.*, 26 A.3d 430, 441 (N.J. 2011) ("[I]ndividuals may be independently liable for violations of the [NJCFA], notwithstanding the fact that they were acting through a corporation at the time.").[20] This argument is apparently one with which Defendants do not quarrel, as their Reply neither addresses nor disputes as much.

For all of these reasons, the Court will grant Defendants' Motion, but only in part. With respect to the individually named defendants in this suit, summary judgment is granted as to all Counts, except those setting forth claims under the NJCFA (*i.e.*, Counts V and VI).

---

[20] Defendants' Reply does not address this point of law, much less attempt to rebut Choice Energy's argument concerning the same.

**V.     <u>CONCLUSION</u>**

For all of the reasons set forth above, Defendants' Motion for summary judgment is granted, in part, and denied, in part. An Order consistent with this Opinion shall be issued.


Dated: February 9, 2024


<u>/s/ Karen M. Williams</u>
KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE
